UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SDD99, INC., a Florida corporation formerly known as Design Data Systems Corporation,

Plaintiff,

v.

ASA INTERNATIONAL, LTD., a Delaware corporation, et al.,

Defendants.

---

DECISION & ORDER

06-CV-6089CJS

**PRELIMINARY STATEMENT**

Invoking this Court's diversity jurisdiction, plaintiff SDD99, Inc. ("SDD99") has filed suit against defendants ASA International Ltd. ("ASA") and Eastern Bank ("Eastern") seeking, *inter alia*, a declaratory judgment that it is entitled to the release of funds held in escrow by Eastern under the terms of an agreement SDD99 entered into with ASA. (Docket # 1). SDD99, formerly known as Design Data Systems Corporation, is a dissolved Florida corporation whose sole shareholder is Michael Meli, a resident of Rochester, New York. ASA is a Delaware corporation that has its principal place of business in Framingham, Massachusetts. Eastern is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. (Docket # 1, ¶¶ 1-6).

On November 4, 1999, SDD99 and ASA executed an agreement (the "Agreement") pursuant to which ASA agreed to acquire certain assets and to assume certain liabilities of SDD99, a company engaged in the business of designing, developing, marketing and

selling business application software for commercial enterprises. (Docket # 6-4; Docket # 13-12, ¶ 3). The Agreement contained various representations and warranties made by the parties and, as a means of guaranteeing those made by SDD99, SDD99 and Meli agreed jointly and severally to indemnify ASA against losses aggregating in excess of $75,000 that resulted from any warranty breach. (Docket # 6-4 at ¶ 7.2(a)). The Agreement further required ASA to deposit a portion of the purchase price ($250,000) into an escrow account maintained by Eastern to pay any claims for indemnification (the "Fund"). (*Id*. at ¶ 7.2(b)). Any funds remaining in the Fund following the payment of claims against it were to be delivered by Eastern to SDD99. (*Id*. at ¶ 7.2(c)).

The parties agreed to the following procedures in the event that ASA identified any claim it believed qualified for indemnification from the Fund. First, ASA was required to deliver to Eastern, with a copy to SDD99, an officer's certificate specifying the claim and the amount of the alleged loss. (*Id*. at ¶ 7.2(e)). Eastern agreed to pay such claim after the expiration of thirty days provided that SDD99 had not delivered to Eastern a written objection to the claim within the thirty-day period. (*Id*. at ¶ 7.2(f)). In the event of an objection, the parties were obligated to "attempt in good faith" to resolve the dispute. (*Id*. at ¶ 7.2(g)(i)). If no agreement could be reached within thirty days of the objection, the Agreement provided that "such dispute . . . be submitted for arbitration" to be conducted in New York City pursuant to the rules of the American Arbitration Association (the "AAA"). (*Id*. at ¶¶ 7.2(g)(ii) and (iii)). According to the terms of the Agreement:

> The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the validity and amount of any claim in such Officer's Certificate or claim during the Escrow Period shall

> be binding and conclusive upon the parties to this Agreement. Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).

(*Id*. at ¶ 7.2(g)(ii)).

On June 13, 2000, ASA delivered a demand upon the Escrow Fund. (Docket # 1 at ¶ 16). SDD99 objected to that claim on July 10, 2000 (Docket # 1 at ¶ 18), and ASA filed a demand for arbitration with the AAA by letter dated October 24, 2000. (Docket # 13-12 at ¶ 17; # 13-15). On November 3, 2000, ASA delivered second and third demands to Eastern, which SDD99 objected to on November 15, 2000. (Docket # 13-12 at ¶ 20; # 13-16).

Following the demand for arbitration, the parties attempted to resolve the disputes on their own without arbitration. (Docket # 6-2, ¶¶ 5-7). According to ASA, the arbitration was held in abeyance for this purpose at the joint request of the parties. (*Id.* at ¶ 7). The AAA file reveals that by letter dated August 15, 2001, the AAA advised the parties of its policy to hold cases in abeyance for up to one year, which could be extended upon payment of an administrative fee. (*Id*. at ¶ 8; # 6-7). The letter also informed them that a case could be reopened upon a new demand for arbitration, accompanied by payment of an additional fee. (*Id*.). On March 19, 2002, the AAA reopened its case at the request of ASA. (Docket # 13-12 at ¶ 31; # 13-19). On January 14, 2003, the AAA again wrote to the parties, this time stating that the case would be closed "unless advised by either party on or before January 24, 2003." (Docket # 13-12 at ¶ 32; # 13-20). The letter reiterated that the case could be reopened with a new demand and a filing fee. (*Id*.). The parties were thereafter notified by letter dated February 19, 2003 that the AAA had closed the file. (Docket # 13-12 at ¶ 34; # 13-21).

In March of 2004, counsel for ASA contacted counsel for SDD99 to reinitiate settlement discussions "so as to avoid any future arbitration and/or litigation concerning this matter." (Docket # 6-2 at ¶ 10; # 6-9). Counsel for SDD99 responded in July 2004 that it was not interested in further discussions. (Docket # 6-2 at ¶ 12). On October 28, 2005, SDD99 made a written demand on Eastern for release and disbursement to it of the Fund, but Eastern refused to release the Fund, indicating its intention to file an interpleader action. (*Id.* at ¶¶ 12-14; # 6-13). For several months thereafter, the parties again engaged in negotiations, which were ultimately unsuccessful. (Docket # 6-2 at ¶¶ 15-17; # 6-14; # 6-15). On February 14, 2006, SDD99 filed the instant action seeking a declaratory judgment that it is entitled to the Fund, specific performance requiring immediate release of the Fund and monetary damages. (Docket # 1 at ¶¶ 39-57).

Currently before this Court are ASA's motions to stay the pending litigation and to compel SDD99 to arbitrate. (Docket # 6). SDD99 opposes the motions (Docket # 13), and Eastern takes no position on the motions.[1] For the following reasons, I determine that a stay should be granted and the parties should be directed to pursue arbitration.[2]

---

[1] On May 17, 2006, the Court ordered that the litigation against Eastern be stayed pending the outcome of the Court's determination whether SDD99 or ASA is entitled to the Fund. (Docket # 17).

[2] These motions are decided by Decision and Order because motions to stay litigation and order arbitration are non-dispositive and thus within a magistrate judge's jurisdiction to determine. *Herko v. Metropolitan Life Ins. Co.*, 978 F. Supp. 149, 150 (W.D.N.Y. 1997).

## DISCUSSION

### A. The Scope of the Federal Arbitration Act

The Federal Arbitration Act (the "FAA") provides that a written arbitration provision "in a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That provision evidences "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 147 (2d Cir.) (the FAA creates a "strong presumption in favor of arbitration"), *cert. denied*, 543 U.S. 874 (2004). Consistent with that policy, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contact language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. at 24-25. *See Security Ins. Co. v. TIG Ins. Co*., 360 F.3d 322, 325 (2d Cir. 2004), *cert. denied*, 543 U.S. 871 (2004).

In order to effectuate Congress's "clear intent . . . to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible," the Act authorizes two procedural mechanisms for doing so: an order staying litigation that involves an issue or issues referable to arbitration, 9 U.S.C. § 3; and an order compelling the parties to arbitrate in accordance with the terms of their agreement, 9 U.S.C. § 4. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22. The Supreme Court has observed that, like Section 2, these sections "manifest [the] liberal federal policy favoring arbitration agreements." *EEOC v. Waffle House,*

*Inc.*, 534 U.S. 279, 289 (2002) (citations omitted). *See*, *e.g.*, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995) ("the FAA's primary purpose [is to] ensur[e] that private agreements to arbitrate are enforced according to their terms"); *Allied-Bruce Terminex Cos., Inc. v. Dobson*, 513 U.S. 265, 270 (1995) ("the basic purpose of the [FAA] is to overcome courts' refusals to enforce agreements to arbitrate"). *See also WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) ("The Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed'") (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

Here, the parties entered into an agreement to arbitrate disputes concerning demands for indemnification from the Fund, and their agreement is reflected in Section 7.2(g) of the Asset Purchase Agreement between SDD99 and ASA. As an initial matter, the parties dispute whether their agreement is subject to the FAA – SDD99 maintaining that it is; ASA maintaining that it is not. The dispute centers on whether their arbitration agreement is contained in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. ASA argues that the Agreement at issue in this case falls outside the reach of the FAA because "(1) the Agreement did not concern employment in commerce, (2) the production of goods for commerce, or (3) activities affecting commerce." (Docket # 13-1 at 10). SDD99 counters that the Agreement plainly involved an interstate transaction.

In evaluating ASA's contention, this Court is guided by the Supreme Court's decision in *Allied-Bruce Terminex Cos., Inc. v. Dobson*, 513 U.S. 265 (1995), addressing the meaning of the statutory language at issue. There, the Court held that Congress' use of the term

"involving commerce" in Section 2 of the Act evidences its intention "to exercise [its] commerce power to the full." *Allied-Bruce Terminex Cos., Inc.*, 513 U.S. at 277. Such a broad interpretation, the Court reasoned, "is consistent with the Act's basic purpose, to put arbitration provisions on "the same footing" as a contract's other terms." *Id*. at 275 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce' – that is, 'within the flow of interstate commerce'") (quoting *Allied-Bruce Terminex Cos., Inc.*, 513 U.S. at 273).

The Court further clarified in *Allied-Bruce Terminex* that a contractual arbitration provision is subject to the FAA where the transaction evidenced by the agreement "in fact" involves interstate commerce, even if the parties did not contemplate a connection to interstate commerce. *Allied-Bruce Terminex Cos., Inc.*, 513 U.S. at 281. In addition, for Congress's Commerce Clause power to be implicated, the parties need not demonstrate "any specific effect" that their transaction has on interstate commerce "if in the aggregate[,] the economic activity in question would represent a general practice ... subject to federal control." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. at 56 (internal quotations omitted).

In this case, I find that the transaction evidenced by the Agreement in fact involved interstate commerce. The Agreement relates to the sale by SDD99 to ASA of its business through an asset purchase agreement. The Agreement defines SDD99's "Business" as "designing, developing, licensing, supporting, maintaining, selling and marketing and implementing software for commercial purposes." (Docket # 6-1 at ¶ B). The assets purchased included SDD99's software and all of its intellectual property, such as its patents, copyrights and

trademarks, as well as its end-user software licenses, maintenance and implementation contracts. (*Id*. at ¶ 1.1(a)).

The record before this Court makes clear that as a condition of the sale, SDD99 assigned to ASA various software licenses that it had entered into with out-of-state customers. For example, one of the disputes resulting in a claim upon the Fund relates to an agreement by AEI Music Network Incorporated ("AEI"), a company with its principal place of business in Seattle, Washington, to purchase comprehensive business software from SDD99, which had its offices in Florida. (Docket # 13-12, ¶¶ 12-15; # 13-13). In addition, the asset purchase itself involved the same day wire transfer of $4,750,000 in funds from ASA to SDD99, a transaction that itself necessarily involved interstate commerce. (Docket # 6-4 at ¶ 1.2). *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980) ("[B]anking and related financial activities are of profound local concern . . . . Nonetheless, it does not follow that these same activities lack important interstate attributes.").

Thus, the interstate nexus is not premised, as ASA contends that SDD99 maintains, upon the fact that the purchaser is a company registered and having its principal place of business in a state different from the state in which the seller company is registered and has its principal place of business. I do not understand SDD99's contention to be so narrow and, in any event, the interstate commerce connection plainly extends beyond the simple fact that the agreement was executed by corporate citizens of different states.

**B. <u>Sections 3 and 4 of the FAA</u>**

Having concluded that the Agreement is within the ambit of the FAA, I turn to the question of whether ASA is entitled to a stay of this litigation under 9 U.S.C. § 3 and an order

compelling arbitration under 9 U.S.C. § 4. The Supreme Court has held that a federal court's inquiry under these sections is limited to consideration only of "issues relating to the making and performance of the agreement." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Section 4 provides:

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement . . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . . If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4.

The Second Circuit has made clear that in determining both whether a stay under Section 3 is appropriate and whether an order compelling arbitration is appropriate under Section 4, the court must resolve four issues: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those

claims to be nonarbitrable; and (4) if some but not all claims are arbitrable, whether the remaining claims should be stayed pending arbitration. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (interpreting Section 4); *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75-76 (2d Cir. 1998) (interpreting Section 3).

Here, the Agreement between the parties contained a written arbitration provision specifying that disputes relating to claims upon the Fund be submitted for arbitration under the rules of the AAA. This litigation involves issues relating to disputed claims under the Fund. Indeed, the action was initiated following Eastern's notice to the parties of its intention to file an interpleader action because of "conflicting instructions to the Escrow Agent in regard to the release of the Escrow Fund." (Docket # 6-13).

SDD99 argues that this litigation includes issues beyond those as to which ASA delivered officer's certificates, and that therefore the court should find that this case does not involve issues referable to arbitration. Contrary to ASA, I find that the subject matter of the disputes – whether ASA should be indemnified from the Fund for claimed losses resulting from alleged breaches of warranties made in the Agreement – is within the scope of the parties' arbitration agreement. Questions as to whether ASA has complied with the terms of the arbitration agreement in pursuing the claims, such as, by properly filing an officer's certificate, are issues to be determined by the arbitrator, not this Court. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. at 62 n.8 ("'The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'") (quoting *Moses H. Cone Mem'l*

*Hosp.*, 460 U.S. at 24-25). *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1196 (2d Cir. 1996) (allegation that claims were time-barred should be determined by arbitrator, not court); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991) ("any limitations defense – whether stemming from the arbitration agreement, arbitration association rule, or state statute – is an issue to be addressed by the arbitrators").

Seeking to distinguish the above-cited authority, SDD99 argues that ASA is in "default in proceeding with . . . arbitration" and is thus statutorily precluded by the terms of Section 3 from seeking a stay. While a substantial body of caselaw has developed on the meaning of the term "default," the touchstone of that analysis appears to be the Second Circuit's 1942 decision in *Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 989 (2d Cir. 1942). There, the court interpreted the statute's limiting clause "to refer to a party who, when requested, has refused to go to arbitration or who has refused to proceed with the hearing before the arbitrators once it has commenced." *Id.*

Since that decision, courts interpreting that phrase have recognized that if a party takes actions inconsistent with its right to arbitrate, those actions may amount to a waiver. *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 109 (2d Cir. 1997); *Doctor's Assoc., Inc. v. Distajo*, 66 F.3d 438, 455 (2d Cir. 1995) ("A party waives his right to arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that right") (quoting *Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966) (*per curiam*)), *cert. denied*, 517 U.S. 1120 (1996). In a comprehensive opinion analyzing the development of the law on the waiver doctrine in the context of arbitration agreements, the Second Circuit observed that "the modern evolution of our waiver doctrine" has resulted in a judicial distinction "between

cases where the waiver defense was based on prior litigation by the party seeking arbitration – when the court should decide the issue of waiver – and those when the defense was based on other actions [when the arbitrator[s] should decide the issue of waiver]." *Doctor's Assoc., Inc. v. Distajo*, 66 F.3d at 456).

Consistent with that law, waivers are not to be lightly inferred, *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985), and generally will be inferred only where a party actively participates in a litigation for some period of time only later to assert its desire to stay the litigation and proceed to arbitration, *see*, *e.g.*, *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993) ("[w]aiver will be inferred when a party engages in protracted litigation that results in prejudice to the opposing party"); *Com-Tech Assoc. v. Computer Assoc. Int'l, Inc.*, 938 F.2d 1574, 1576 (2d Cir. 1991), and only where those actions have caused the opposing party prejudice, *see*, *e.g.*, *Cotton v. Slone*, 4 F.3d at 179; *Kramer v. Hammond*, 943 F.2d 176, 178 (2d Cir. 1991); *Rush v. Oppenheimer & Co.*, 779 F.2d at 887 ("[g]iven th[e] dominant federal policy favoring arbitration, waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated") (citations omitted). In other words, waiver will not be inferred from the fact of delay alone. *Rush*, 779 F.2d at 887; *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945); *Broadcort Capital Corp. v. Dutcher*, 859 F. Supp. 1517, 1519 (S.D.N.Y. 1994).

Here, the record does not show that ASA has ever refused to participate in arbitration or engaged in conduct in this litigation inconsistent with its right to arbitrate. When this action was filed, ASA simultaneously filed an answer, which asserted affirmative defenses based upon the arbitration agreement (Docket # 4) and moved for a stay and an order compelling

arbitration. (Docket # 6). It has not participated in this litigation to the detriment or prejudice of SDD99, such as by engaging in discovery, participating in judicial settlement conferences or filing motions other than those currently before the court – which were filed at ASA's earliest opportunity following suit. *Compare Kramer v. Hammond*, 943 F.2d at 179 ("By engaging in such aggressive, protracted litigation for over a four-year period, [the party seeking arbitration] waived his contractual right to arbitration. To allow him to invoke arbitration at this late date would severely prejudice [the party opposing arbitration], who has expended a great deal of time and money in contesting [his opponent's] motions and appeals."); *with Rush*, 779 F.2d at 889 ("none of the individual aspects of the pretrial proceedings conducted by the defendants – the eight-month delay, the motion to dismiss, the conduct of discovery, and the answer – prejudiced [plaintiff] in any sense that would support a conclusion of waiver by defendants of their contractual right to arbitrate").

During oral argument, SDD99 also argued that ASA is foreclosed by the terms of Section 4 from obtaining an order compelling arbitration because ASA's "failure, neglect or refusal to perform" its arbitration obligations is "in issue," thus requiring the court to determine that issue before entertaining a motion to compel arbitration. SDD99 misapprehends this provision of Section 4. The provision refers to the actions of the respondent (SDD99), not the movant (ASA). *Doctor's Assoc., Inc.*, 66 F.3d at 454; *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568, 571-72 (2d Cir. 1968). The first sentence of Section 4 authorizes a party aggrieved by the alleged "failure, neglect or refusal of *another*" to arbitrate to move for an order compelling arbitration. 9 U.S.C. § 4 (emphasis added). The subsequent provision in Section 4 requiring the court to refrain or postpone from ordering arbitration where there is an

issue of "the failure, neglect or refusal" to perform the terms of an arbitration agreement refers to the failure, neglect or refusal of the party referenced in the first sentence of Section 4 – the respondent. *Id.* Here, there is no genuine issue that SDD99 is currently refusing to participate in arbitration (albeit because it believes that ASA has waived or foregone its right to demand arbitration). Insofar as ASA has raised issues of equitable bars to arbitration, such as, waiver (based on ASA's acts outside this litigation) or laches, those are issues for the arbitrator to determine. *See* cases cited *supra* at 10-11. *See also Doctor's Assoc., Inc.*, 66 F.3d at 456 (waiver defense is a statutorily mandated inquiry under Section 3, but is a broader equitable defense under Section 4 to be determined by arbitrator, not court).

**C. <u>The Agreement's Choice-of-Law Provision</u>**

ASA argues that even if the Court were to find that the arbitration agreement is covered by the FAA, the Court should ignore the provisions of the FAA because the Agreement contains a choice-of-law provision requiring the application of state law. (Docket # 13-1 at 10). The relevant provision states:

> This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. The parties agree that, subject to the provisions of Section 7.2(g) hereof, the courts of the State of New York and the federal courts located therein shall have exclusive jurisdiction over the resolution of any disputes between the parties, and each party waives any objections based on jurisdiction, venue, forum non conviens or similar matters, and consents to service of process as provided by the rules of the State of New York.

(Docket # 6-4 at ¶ 10.8).

SDD99 argues that this provision evidences the parties' intent to apply Massachusetts substantive law and federal procedural law (by virtue of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)) to the Agreement, including its arbitration provisions. (Docket # 13-1 at 10-12). By contrast, ASA contends that "motions to stay proceedings and compel arbitration brought under the FAA are governed by federal law irrespective of the choice of law clause in an underlying contractual agreement," citing *Robinson v. Bache & Co.*, 227 F. Supp. 456 (S.D.N.Y. 1964). (Docket # 6-1 at 6).

ASA's broad contention has been rejected by the Supreme Court. In *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989), the Court made clear that "[i]nterpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration – rules which are manifestly designed to encourage resort to the arbitral process – simply does not offend the rule of liberal construction . . . [or] any other policy embodied in the FAA." Indeed, in that case, the Court enforced the parties' contractual decision to abide by California law, even recognizing that enforcement of that provision might result in a stay of arbitration that would otherwise proceed under the FAA. *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. at 479. Of course, enforcement of a choice-of-law provision remains subject to federal preemption "to the extent that it actually conflicts with federal law – that is, to the extent that it 'stands as a obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 477 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). *See also Allied-Bruce Terminex Cos., Inc.*, 513 U.S. at 272-73.

Analysis of lower court decisions, including Second Circuit decisions, interpreting *Volt*, reveals the complexities inherent in interpreting choice-of-law provisions in contracts containing arbitration provisions. *See*, *e.g.*, *Security Ins. Co. v. TIG Ins. Co.*, 360 F.3d at 323 ("This case presents a recurring and troubling theme in many commercial contracts: to what extent must a court – confronted with a choice-of-law provision in a contract – incorporate the designated state's statutory and common law governing arbitrations even when doing so seems contrary to the Federal Arbitration Act"). As the Second Circuit has explained, a choice-of-law provision that introduces ambiguity as to the parties' intent regarding their arbitration agreement will not be enforced without "a specific reference to the restrictions on the parties' substantive rights or the arbitrator's powers to establish that the parties clearly intended to limit their rights under the FAA." *Id*. at 327. Thus, the first inquiry is whether the choice-of-law provision in the Agreement at issue here introduces ambiguity as to the parties' agreement to arbitrate.

While neither party has specifically addressed that question, I note that the parties' choice-of-law provision gives rise to at least some doubt as to their intention to apply Massachusetts substantive law to their arbitration agreement. The choice-of-law provision, which is found at the end of the contract and refers to the entire Agreement, contains the phrase "subject to [the] provisions of Section 7.2(g) hereof [the section dealing with arbitration]." On the one hand, that phrase may evidence the parties' intention that Massachusetts law apply to the terms of the Agreement except the arbitration terms; on the other hand, the use of the words "subject to" rather than "except as to" may evidence the parties' intent to merely acknowledge that they have agreed to arbitrate certain disputes, rather than to litigate them in federal court.

Determination of the parties' intent, however, is unnecessary to resolution of the pending motions. Even if Massachusetts substantive law were applied, rather than federal law, the outcome would be no different. Massachusetts has adopted the Uniform Arbitration Act for Commercial Disputes (the "Massachusetts Act"), Mass. Gen. Laws ch. 251, § 1 *et seq.*, and those terms generally parallel those contained in the FAA. For example, Section 1 of the Massachusetts Act provides that written agreements to arbitrate "shall be valid, enforceable and irrevocable, save upon grounds as exist at law or in equity for the revocation of any contact." Mass. Gen. Laws ch. 251, § 1. This same language is found in Section 2 of the FAA.

Similarly, as with Section 3 of the FAA, Section 2(d) of the Massachusetts Act authorizes a stay of litigation involving "[a]ny action or proceeding involving an issue subject to arbitration." Mass. Gen. Laws ch. 251, § 2(d). *See Town of Danvers v. Wexler Constr. Co., Inc.*, 422 N.E.2d 782, 785 and n.5 (Mass. App. Ct. 1981). Such a stay is mandated where a party has applied for, or a court has issued, an order compelling arbitration; no other limiting provisions are contained in that section. *Id.*

Like Section 4 of the FAA, Section 2(a) of the Massachusetts Act permits "a party aggrieved by the failure or refusal of another to proceed to arbitration" to apply for an order compelling arbitration. Mass. Gen. Laws ch. 251, § 2(a). Under the terms of Section 2(a), the only issue for the court to determine under that provision is "the existence of the agreement to arbitrate," and if the court determines one does exist, the court "shall" order arbitration. *Id.* Finally, Section 4(e) of the Massachusetts Act provides:

> An order for arbitration shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown.

Mass. Gen. Laws ch. 251, § 2(e). *See Home Gas Corp. of Mass., Inc. v. Walters of Hadley, Inc.*, 532 N.E.2d 681, 683 (Mass. 1989) (like courts interpreting the FAA, courts interpreting the Massachusetts Act should determine whether a party has taken actions inconsistent with, and thus has defaulted in pursuing, its rights to arbitrate before compelling arbitration).

Read together, the provisions of the Massachusetts Act reflect as liberal a policy favoring arbitration as do the provisions of the FAA. *See Commerce & Industry Ins. Co. v. Bayer Corp.*, 742 N.E.2d 567, 574 (Mass. 2001) (acknowledging the "strong presumption of arbitrability" reflected in both federal and Massachusetts policies "favoring arbitration"); *Town of Danvers v. Wexler Constr. Co., Inc.*, 422 N.E.2d at 784 ("[Massachusetts] courts have consistently held that [the Massachusetts Act] express[es] a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes"). For the same reasons that I find that a stay of this litigation and an order compelling arbitration would be appropriate under the FAA, I find that they would be appropriate under the Massachusetts Act. Accordingly, ASA's pending motions should be granted irrespective of whether federal or Massachusetts law applies.[3]

[3] SDD99 argues that arbitration is barred by the six-year limitations period applicable to breach of contract claims under both Massachusetts and New York law. (Docket # 13-1 at 12-16). Even assuming the possible merit of such a claim, *but see Shafnacker v. Raymond James & Assoc., Inc.*, 683 N.E.2d 662, 666-67 (Mass. 1997) ("the filing of a claim for arbitration is not an 'action' within the meaning of [Massachusetts statutes of limitation]") (citing *Carpenter v. Pomerantz*, 634 N.E.2d 587, 590 (Mass. App. Ct. 1994) (finding the Massachusetts statute of limitations applicable to contract claims to be inapplicable to demands for arbitration)), any limitations defenses SDD99 wishes to assert should be addressed to the arbitrator(s). *See*, *e.g.*, *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d at 121; Mass. Gen. Laws ch. 251, § 2(e).

## CONCLUSION

For the foregoing reasons, ASA's motions to stay this litigation and to compel arbitration **(Docket # 6)** are **GRANTED**. ASA is hereby directed to notify the Court of the arbitrator's decision in writing within ten (10) days of such determination.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 29, 2007